[Civ. No. 2751.   Fourth Dist.—June 17, 1941.]

SOVEREIGN OIL CORPORATION (a Corporation), Plaintiff, v. F. R. C. FENTON et al., Respondents; EDLOU COMPANY (a Corporation) et al., Appellants.

Clarke & Bowker, Robert M. Clarke, Britton Bowker and Dixie Dunnigan for Appellants.

Finlayson, Bennett & Morrow for Respondents.

BARNARD, P. J.—This is an action involving the right to the proceeds of an oil well located in a certain block in the city of El Segundo. By an ordinance of this city the drilling of an oil well in this area was forbidden unless a permit therefor was secured. Desiring to limit the number of wells in subdivided areas it had been the policy of the city council to refuse such permits where application was made in connection with a lease of part of the lots in a particular block, unless opportunity was offered to other lot owners in that block to join in the lease and to share in the proceeds of the well.

There were 18 lots in block 31 of this city. Under date of November 24, 1937, a lease between the owners of 11 of these lots, who will be referred to as Group No. 1, and the plaintiff, was executed. This lease, among other things, provided that drilling was to start within thirty days after a permit from the city was secured; that the lease should be considered a "community lease", as if all lessors had undivided interests in the entire area leased; that each lessor should share in the rentals and royalties in the proportion which his land bore to the total area, computed on a square footage

basis; that the lease might be executed by the lessors in any number of separate copies or counterparts; and that

"In the event further square footage is included within this lease by agreement or by requirement of the city authorities of El Segundo, the County of Los Angeles or the State of California, said additional footage shall be taken into account in computing the distribution of royalties as though it had originally been included herein."

On December 8, 1937, the plaintiff's application for permission to drill a well on one of the eleven lots mentioned in this lease was presented to the city council. As disclosed by the minutes of that meeting, the application was continued one week and the clerk was instructed immediately to communicate with the owners of other lots in that block which were not included in plaintiff's lease. On December 10, 1937, the clerk wrote letters to the other lot owners in this block, who will be referred to as Group No. 2, advising them of this application for a permit and informing them that on December 15, 1937, the city council "will grant the permit prayed for, conditioned upon said company permitting other property owners in said block and not included in its lease to join said lease should they so desire within a reasonable time after the permit is granted". These owners were also given plaintiff's name and address so that they might communicate with it. The minutes of the meeting of December 15, 1937, show the adoption of a resolution granting to this plaintiff a permit for drilling the well in question and neither this resolution nor the permit itself say anything about requiring any additional "footage" to be included in the lease. On December 16, 1937, the city clerk wrote a letter to the plaintiff saying that permission to drill had been granted on December 15, and that "Said permission is conditioned upon your filing with the City Clerk a letter signed by all persons, firms or corporations whose signatures might be necessary, consenting and agreeing to permit any property in said Block 31, not now included in your lease, to be included in said lease at any time prior to the setting of your final water string". The court found that the sending of this letter had not been authorized by the council and this finding seems to be sustained by the evidence.

At this time a part or all of the seven lots owned by Group No. 2 were under lease to the Elsie Oil Company. This lease

was later cancelled and those lots quitclaimed to those owners by a quitclaim deed recorded on January 26, 1938.

Shortly after the clerk's letter of December 10, 1937, was received by the owners of the other lots in this block two of these owners called at the plaintiff's office and expressed a desire of members of that group to join in the lease. The plaintiff handed them a copy or counterpart of that original lease and thereafter that copy was signed by Group No. 2, the owners of the other seven lots, each owner setting opposite his signature the number of the lot in that block which he owned, with the square footage thereof, in like manner as the original lease had been signed by the original lessors in Group No. 1. These owners acknowledged their signatures to this copy of the lease on February 2, 1938, and the plaintiff corporation also signed that copy of the lease, through its president and secretary, their acknowledgment thereof being dated February 8, 1938.

After the plaintiff received the clerk's letter of December 16, 1937, one of its officers showed it to two of the members of Group No. 1 and told them his company would have to take the other lot owners into the lease. No objection was then made but on February 16, 1938, an officer of the plaintiff told a committee representing Group No. 1 that the plaintiff and the owners in Group No. 2 had executed a copy of the lease, and later that day this committee sent the plaintiff a letter saying that at the time the application for a permit was made to the city council they understood that the council had a rule "by which they withheld permits unless all of the owners of lots within the block upon which the permit was granted were given an opportunity to join in the lease", but that they further understood that the rule "did not apply to lots which were included in an oil lease to any other company". They then stated that they understood that Group No. 2 had leased their lots to the Elsie Oil Company, and informed the plaintiff that they would resist the inclusion of any other lots within the lease.

The setting of the final water string in the well occurred about the middle of March, 1938, and some time thereafter the well came into production. On or about the first of June, 1938, an agreement was entered into between the plaintiff and Group No. 1 under the terms of which one-half of the

rentals and royalties were paid to the members of Group No. 1 and the other half was deposited with a trust company to await determination as to the rights of members of Group No. 2.

This action was begun on June 23, 1938. The complaint was entitled "Complaint in Interpleader". It set up the conflicting claims of Group No. 1 and Group No. 2 to the landowners' royalties provided for in the lease, with the general facts as to execution of both parts of the lease and as to the granting of the permit, and prayed that the defendants be required to interplead with respect to their claims, that the plaintiff be discharged upon payment of the moneys into court, and for other equitable relief. Various cross-complaints were filed and the action proceeded to trial. The court found in favor of Group No. 1 and entered a judgment which, in general effect, provided that the members of Group No. 2 had no right or interest in the royalties from this well and that all thereof should be paid to the members of Group No. 1 and one or two additional parties, with which we are not here concerned. From this judgment a part of Group No. 2 of the defendants have appealed.

The appellants first contend that the court erred in failing to make an interlocutory order passing upon the plaintiff's right to maintain an action in interpleader, in failing to dismiss the action because the plaintiff was not a disinterested stakeholder, and in not making any finding or judgment on the subject of interpleader. While the complaint lacked one of the essentials of a complaint in interpleader it stated a cause of action for declaratory relief. Moreover, appellants concede that at the opening of the trial "it was agreed by counsel that the action could be treated as one for declaratory relief" and during the trial, in explaining to the court the purpose of offering certain evidence, the leading counsel for the appellants stated to the court: "As I understand, this is an action for the purpose of determining the rights of the parties. . . . We are here from the start in an action in equity to determine the rights of these parties." The action was tried upon this theory under sufficient pleadings and no error appears in this connection.

The main questions here presented are whether the court's findings and conclusions to the effect that none of the appellants is, or ever has been, a party to the lease under

which this well was drilled or is or has been included within its provisions, are supported by the evidence, and whether the findings support the judgment. The main finding in this connection is that "said permit did not require, nor did the city authorities of said city of El Segundo then or at any time require any further square footage, or any footage to be included in the lease" which was entered into between Group No. 1 and the plaintiff.

While, strictly speaking, the finding last referred to is supported by the evidence to the extent that the other lot owners were not required to come in whether they wanted to or not, there is no finding on the essential issue as to whether the city council required that an opportunity be given to owners of lots in this block which were not included in the original lease to join in the lease, and there are no direct findings as to the facts in connection with the issue as to whether such owners availed themselves of that opportunity. We cannot agree with the contention of the respondents, meaning Group No. 1 of the defendants, that the terms of the permit which was issued by the city council and the resolution authorizing it are conclusive on these matters. The permit, required by the ordinance, might well set forth certain conditions and restrictions governing the manner in which the well might be drilled. But the setting forth therein of such conditions, does not necessarily establish that there had not been another "requirement of the city authorities" which had to be met before the permit was issued at all. While the permit was necessary before the well was drilled the rights of the parties, aside from the mere incident of drilling, depend more upon the terms of the lease than upon the wording of the permit. And the provision of the lease relating to the inclusion of additional land in the lease was based not upon any particular conditions which might be set forth in the permit to drill, or in the resolution authorizing the issuance thereof, but upon any "requirement of the city authorities". The real issues are as to whether there was such a requirement here, within the meaning of that provision of the lease, and whether what was done by all concerned was sufficient to bring the appellants in as participants under the lease.

The original lease recognized the necessity of a permit from the city and the possibility of a requirement leading

to the inclusion of other lots. It provided that the respective lot owners should share in the royalties on a square footage basis regardless of who owned the lot on which the well was drilled, and provided that any further square footage included within the lease by requirement of the city authorities should share in the royalties as though it had been originally included.

When the permit was applied for, pursuant to the terms of the lease, the matter came on for hearing before the city council on December 8, 1937. Mr. Powers, the secretary of the plaintiff corporation, testified that he was present at that meeting and that several members of Group No. 1 were also present. He testified that one of the councilmen asked whether they were willing to take in the owners of other lots in this block, that there was quite a discussion as to a time limit for this purpose and that, finally, the mayor stated that they would issue the permit "if we would permit the other lot owners to come in by the time the final string of casing was set". The city clerk testified that on that occasion members of the council asked Mr. Powers if his company would be willing to include in the lease other lots in the block; that Powers answered in the affirmative and stated that there was a paragraph in the lease which provided for this; that the council commended Powers and his company for including such a provision in the lease; that Powers responded that this had been done because of knowledge of difficulties of that nature in the past; and that the length of time to be allowed for such purpose was then discussed.

With respect to the meeting of the council which was held on December 15, 1937, Powers testified that two representatives of Group No. 1 were present, that the mayor instructed the city attorney to advise with the city clerk "as to notifying the other lot owners so there could be no question but what they would be given an opportunity to join with the other lots in block 31"; that there was then considerable discussion as to the time limit which was finally fixed as the time the final string of water casing was set; that he told the council this would be 45 or 50 days after the well was spudded in; and that "they said in that event they would instruct the clerk to prepare a permit and issue it". The city clerk testified that Powers was present at the meeting on December 15, 1937, but when asked whether something

was said at that time about giving the other lot owners more time in which to make up their minds whether they wanted to come into the lease or not, he replied: "I don't remember." A little later, however, he testified that there was no discussion at that meeting to the effect that the other lot owners were already tied up on a lease to other oil companies, that they would need some time to get released from that lease if they desired to, and that they could have until the setting of the final water string within which to make up their minds.

There can be no question that it was the policy of the city council, in view of the limited number of wells that would be permitted in this subdivided area, to insist that other lot owners should be given an opportunity to join in the lease when application for a permit was made in connection with a lease covering only a part of a block. It is equally clear that the parties to the original lease understood this situation and contemplated such a requirement when that lease was executed. We think it is equally clear that the "requirement" the parties had in mind and intended was not one compelling the other lot owners to join in the lease but one giving them the opportunity to do so. These matters were not only understood in advance but were quite fully discussed at a meeting of the council on December 8, 1937, with representatives of Group No. 1 present. The minutes of that meeting show that the matter was continued for a week and the clerk instructed to communicate with the other lot owners. In doing so, the clerk notified those lot owners not only that the permit was to be granted upon condition that the other lot owners were to be included if they so desired, but that they were to have a reasonable time after the permit was granted within which to come in. This notice was in accordance with the discussion which had taken place at the council meeting. The other lot owners, after receiving this notice, contacted the plaintiff, expressed a desire to join in the lease, secured a release and quitclaim from the other oil company, and after completing that matter signed and acknowledged a copy of the original lease, setting the numbers of their lots and their respective square footages opposite their signatures, all of which was completed on February 2, 1938, some six weeks before the expiration of the time limit discussed at the council meeting.

It clearly appears that the city council intended to require that these other lot holders be given an opportunity to join in the lease. There is no evidence indicating that the city council intended to change this requirement by anything that was said or done at the meeting on December 15, 1937. It appears, without question, that the city clerk, the plaintiff, and these appellants understood after the permit was issued that this requirement was still in force and effective, and that the permit had been issued with that understanding. We think it also appears that the members of Group No. 1 also had this understanding, even after the permit was issued, since the letter sent to the plaintiff by their committee on February 16, 1938, after notification that Group No. 2 had joined in the lease, indicates this. While they stated in that letter that they would resist the inclusion of the other lots in the lease, the reason there given for their objection was not their understanding that the permit had been issued without any condition for allowing the other lot owners to join in the lease. They stated that they understood that the council had a rule by which they would refuse permits unless all of the owners of other lots in the same block were given an opportunity to join the lease, but said they understood that this rule did not apply to lots which had been leased to some other company. There was no basis for the only objection that was made, and the other lot owners had already secured a release from the other oil company and had put themselves in a position to comply with the rule of the city council, which Group No. 1 admitted that they thoroughly understood. The letter written on February 16, 1938, is strongly suggestive of the interpretation placed by Group No. 1 both upon the terms of the lease and the situation as it then existed.

The existence of the rule in question seems to have been understood by all parties concerned. There is evidence that on at least two prior occasions the city council had applied this rule and it had been followed, although in neither of those cases was the requirement for permitting other lot holders to join the lease, if they so desired, expressly stated in the permit which was issued. However, it appears that in the next permit of this nature which was issued by authority of the council, in May, 1938, the requirement was expressly inserted in the permit. The extent to which the requirement

in question was understood by the plaintiff is indicated by the fact that in connection with drilling its well upon one of the lots included in the original lease it placed its boiler upon one of the lots belonging to a member of Group No. 2, it placed pipe lines across other lots belonging to members of this group, and shortly after the well was brought in and before this action was brought it placed a tank on another of those lots. It further appears from the evidence that the well, as actually drilled, would necessarily drain oil from under the lots owned by these appellants.

With respect to what occurred at the meeting of the council on December 15, 1937, it may be observed that the matter of still permitting other lot owners in this block to avail themselves of the opportunity to share in the original lease was either discussed again or it was not. If it was, the only evidence of what was then said is found in the testimony of Powers, to which we have referred. If it was not again discussed there is no evidence of any change in the policy on the part of the city council and the fact remains that there had been considerable discussion at the meeting the week before as to giving other lot owners a reasonable time after the issuance of the permit in which to join in the lease and the lot owners were notified to that effect.

■ Moreover, Powers had stated to the council at the meeting on December 8, that the company's lease with Group No. 1 contained a paragraph providing for the inclusion of other lot owners in block 31 who were not already included therein. He was commended for having made this provision and the representatives of Group No. 1 who were present made no objection. If it be assumed that nothing further was said on this matter at the meeting on December 15, the council had a right to rely upon the representation, which had been already made, that this had been provided for and would be done. And, although the representatives of Group No. 1 were again present, the council was not informed of any change in the agreement contained in the lease or in the interpretation thereof. Aside from any other consideration, the members of Group No. 1 should now be estopped to deny the effect of their virtual agreement with the city council.

■ The evidence discloses that there was a requirement on the part of the city authorities that the other lot owners in this

block be given an opportunity to join in the lease under which the well was to be drilled, within the meaning of the quoted clause of the original lease, and that the appellants not only elected to avail themselves of the opportunity furnished by this requirement, but by their acts brought themselves within both substantial and actual compliance with this provision of the original lease. It follows that parts of the findings and conclusions are not sustained by the evidence and that the finding that the city authorities did not actually require other square footage to be included in the lease is not sufficient to support the judgment.

While it is unnecessary to go into the matter further, it may be observed that the pertinent clause of this lease also provided for the bringing in of other land ''by agreement''. This is somewhat ambiguous and the manner of carrying it out is also uncertain. Undoubtedly the parties had in mind the other lots in the same block, and not some other and indefinite area. It may have been intended to permit the plaintiff to extend the lease to other owners in that block by agreement between it and those owners. This seems plausible in view of the representation to the council that provision had been made in the lease for taking such other owners in if they desired. Perhaps the ''agreement'' referred to in this provision of the lease is that of the other lot owners agreeing to come in. In view of the uncertain language used in the lease, the action of Group No. 1 in saying nothing when that representation was made to the council, and in waiving any objection to the manner in which the ''agreement'' had been carried out, by objecting only to an immaterial matter in the letter of February 16, 1938, might well estop them from now asserting that the ''agreement'' portion of this clause of the lease had not been complied with.

For the reasons given the judgment is reversed.

Marks, J., and Griffin, J., concurred.

A petition for a rehearing was denied July 16, 1941, and respondents' petition for a hearing by the Supreme Court was denied August 14, 1941.